No. 29.—GUSTAVUS HENDRICK, plaintiff in error, *vs*. THOMAS and JOHN COOK, defendants in error.

[1.] Riparian proprietors, who own land on the opposite sides of a water course, above ebb and flow of tide water, have a title to the land covered by the water, to the thread, or centre of the stream as it is accustomed to flow in its natural channel.

[2.] Each riparian proprietor has the right to a reasonable use of the water, as it flows along the natural channel of the stream, for domestic, agricultural, and manufacturing purposes ; provided in so using it, he *does not prejudice* or injure the rights of the other proprietors.

[3.] Prior occupation of the water in a stream by one riparian proprietor, for the purpose of turning his mill, does not give him the right to divert the water from the land of the proprietor above, nor to throw the water back upon him in the channel of the stream, without a grant, or license to do so, from such proprietor ; or an enjoyment of such *easement for such a length* of time, as will give a right, under the statute of limitations.

[4.] When the plaintiff and defendants were riparian proprietors, and the defendants erected a mill-dam at a place where they owned the land on both sides of the stream ; but caused the water to flow back in the channel of the stream ten or eleven inches, whereby a valuable mill-shoal of the plaintiff was

drowned to that extent—*Held,* that the throwing back the water in the chan-
nel of the creek by the defendants, was an invasion of the plaintiff's right of
property, and that he was entitled to maintain an action for the *protection of
that right,* and to recover nominal damages; although the water was not
thrown out of the banks of the creek, and no perceptible damage could be
shown. *Held,* also, that the plaintiff was entitled to show to what extent he
had been damnified in consequence of the back water, although the same was not
thrown out of the natural banks of the stream.

Trespass on the case. Tried before Judge FLOYD, in Butts
Superior Court, September Term, 1847.

This was an action brought by the plaintiff against the defend-
ants, for the recovery of damages for erecting a dam across a cer-
tain stream upon their own land, which raised the water in the
natural channel of the stream, so as to throw it back upon a val-
uable mill-shoal above, and raise the water at that point some ten
or eleven inches above its natural flow and current, and thereby
destroy its value for mill purposes, of which stream at the said
mill-shoal, the plaintiff and defendants were proprietors, said
stream being at that point the dividing line between them.

It appeared upon the trial that the plaintiff and defendants were
riparian proprietors, the plaintiff owning the land on one side of
the creek, and the defendants on the other side, where the shoal
alleged to have been overflowed was located. The defendants
erected a mill-dam on the creek below the shoal on their own land,
they being the owners of the land on both sides of the creek, at
the place where the dam was built. The dam raised the water
in the natural channel of the stream, and threw it back on the
shoal to the depth of ten or eleven inches, that is, the water in
the natural channel of the creek, where the plaintiff and defend-
ants are riparian proprietors, is raised by means of the dam ten or
eleven inches above the natural flow and current of the water
in the stream, as it was wont to flow before the erection of the
dam by the defendants. During the progress of the trial, the
plaintiff offered testimony to prove the value of said mill-shoal
not when overflowed, and its then value. Also the plaintiff offer-
ed to prove what the value of the shoal was previous to the erec-
tion of the defendants' dam, and what was the value of it when
the witness saw it overflowed; and that the effect of the back-wa-
ter on the shoal was to render it valueless to the plaintiff. The

plaintiff also offered to prove how much the plaintiff had been *damaged* by the obstruction of the water on said mill-shoal, which testimony so offered, was rejected by the Court, on the ground that the defendants, by their dam, had not thrown the water out of the natural channel of the creek, and consequently the plaintiff was not entitled to recover damages. To which decision of the Court below, the plaintiff excepted.

The Court below then charged the jury that the plaintiff was not entitled to any damage for simply raising the water in the natural channel of the stream, so long as the water continued to be confined by its banks to the natural channel, but if by raising the water by a dam upon his own land, he throws the water out of the natural channel of the stream, the party whose land is overflowed is entitled to damage, and instructed the jury to enquire whether the defendants had by their dam thrown back the water, and whether it had been thus thrown out of the natural channel upon the land of the plaintiff, and if so the plaintiff was entitled to recover. To which charge the plaintiff excepted.

BAILEY & STARK, for the plaintiff in error.

McCUNE & HARMON, for the defendants in error,

Cited the following authorities : *Williams vs. Moreland,* 2 *Barn. & Cress. R. Tyler vs. Wilkinson,* 4 *Mason's R.* 12 *Mass. R.* 311. 17 *Mass. R.* 289. *King vs. Tiffany,* 6 *Conn. R.* 3 *Kent's Com.* 444. *Cooper vs. Hall, Hammond's R.*

BAILEY, in conclusion for plaintiff.

That there are respectable authorities sustaining the views of the Court below, we do not controvert; but we deny that they are sustained by the law. The several rights of riparian proprietors, in many cases, have not been well defined; in others they have been erroneously and loosely stated. The value of water power, as applied to machinery, has so increased in modern times, that it is important that it should be regulated and protected by fixed and known rules of law. I shall endeavor to show that the Common Law furnishes such rules.

In the progress of this cause the Court below committed seve-

ral errors, to which we have excepted; but they all have their origin in, and are referable to this fundamental error predominating in the mind of the circuit Judge who tried the cause, viz: that a riparian proprietor may throw the water upon his neighbor as far and as deep as he pleases, provided he does not overflow his banks, or drown any machinery of his. That is, he may fill the natural channel of the stream for his own use, he having first occupied. Although this doctrine is sanctioned by high authority, we say in the language of Mr. Angell, "If it were founded in law, it would, in its result, throw to the ground the fundamental principles relating to running water, and all the leading cases respecting the usufructuary rights of riparian proprietors." It is my business here, to endeavor to show, that this doctrine, and these authorities, are not founded in law.

And before this Court I shall assume certain postulates as axioms not to be discussed.

1. That property in a water course is derived from the ownership of the land through which it flows, and to which it is an incident.

2. That a grant of land carries to the grantee the *use* of the water on its surface, above tide, in its natural state, as essentially and as absolutely as it does the rocks or trees, or other thing upon its surface.

3. That property in water is not in the *corpus*, but in its use, present and prospective.

4. That he who owns land, bounded on either side by a water course, is a riparian proprietor.

5. That where there are two riparian proprietors directly opposite to each other, each proprietor owns to the middle or thread of the stream, unless limited to the bank by prior deed or grant.

These five foregoing propositions we trust will be taken for granted, but are important to be kept in mind while we discuss the following *disputed* propositions, but which we maintain are legally correct.

1. That each riparian proprietor has a right to the exclusive use of the water in its natural state, as it flows through or over his land.

2. That neither riparian proprietor has a right, unless by deed or grant, or use long enough to presume a grant, to increase or diminish the water beyond the line of his boundary, to the preju-

dice or injury of any other riparian owner, and without his consent.

3. That prior occupancy of itself gives no rights, unless long enough to presume a grant.

4. That the *water power* to which a riparian owner is entitled, consists of the difference of level between the surface where it first touches his land, and the surface where it leaves it.

5. That no riparian proprietor above, below, or collateral, has a right to change or alter this level, to the prejudice or injury of any other.

6. That although such change or alteration produces no present damage, yet an action lies for prospective injury, and to prevent such wrong from ripening into a right.

7. That an incorporeal mill-privilege upon a stream, is as essentially property, and as much protected by law, as any corporeal thing or right.

8. That the law protects such incorporeal property from destruction or injury, while not used or occupied, as effectually as any corporeal thing out of use.

Before we refer to the authorities on which we rely, I beg leave for a moment to test the principle maintained by the court below, by the rules of reason—the soul of the law—and if we prove it has no soul, it is not law.

The Court held that the defendants had a right to throw the water back on plaintiff's shoal to any amount, so long as it is confined to the natural run or channel within the banks. And when plaintiff offered to prove the amount of damage he had sustained, by defendants' thus throwing back the water on his shoal, the Court repelled the evidence, and said, "If the defendants have a right to the use of the water, (as riparian proprietors,) surely plaintiff is not entitled to damages from them for the exercise and enjoyment of this right." Here is clearly a *non sequitur*. Does not every lawyer perceive that the right to the use of the water, as a riparian owner, and the right to damage or injure another by such use, are distinct and separate? Does not every one understand, that a riparian owner may not only use the water on his own land, but so use it as to increase or diminish its depth on that of his neighbor, provided by so doing he does not injure his neighbor's rights. The plaintiff attempted to prove injury or damage, and its amount. He did not deny the defendants' right to the use

of the water, so long as they did not injure him. By repelling the testimony the Court affirmed the right of defendants to damage the plaintiff to any amount, and that he has no redress! Is this either law, reason or justice? We contend it is neither; nay, more, it involves a gross absurdity, for the Court said, since the plaintiff and defendants are riparian owners, [he doubtless intended to say riparian owners on opposite sides of the stream,] and as such were each entitled to a use of the water in the natural channel—therefore he refused to let the plaintiff prove either any damage or its amount! That is, *each* party has a right to use the water as he pleases, or for what purposes he pleases, and yet if defendants make such use as to totally destroy or prevent any use whatever by the plaintiff, he has no redress; he shall not prove such damage; he has an equal right, but no remedy; a right in fancy, but not in fact.

With all respect, I beg leave to say, the ideas of the Court below, as developed in the record, do not seem to be very clear or well defined. What principle of law he intended to lay down, applicable to the case before him, does not, from the record, clearly appear.

It can only be inferred that he holds, that riparian owners, on opposite sides of a stream, have equal right to appropriate the water between them, to any use they please, but that the one first appropriating it all to his own use, cannot be disturbed by the other in that use, however much it may injure him.

It is also to be inferred that he holds the title to land covered by water, is not as clear and absolute as to the adjoining meadow, and that therefore an adjoining riparian may flood and render useless the one, while he cannot the other.

It is also to be inferred that he holds, a man may give a million of dollars for a ledge of rocks utterly valueless for any purpose, except for the fall of water flowing over it; and yet, because he neglects to put such fall to some use, an owner below may render it utterly worthless, by backing the water up on it. If these principles are founded in law, the great jurist who pronounced the common law the perfection of reason, wholly overlooked them, and the acient maxim, "*Utere tuo ut non alienum lœdas,*" is but a mockery.

Keeping in mind that each riparian owner's land extends to the middle of the stream; that the thread of the channel is the boundary, upon what principle of reason can a collateral riparian di-

minish or increase the water within that line, to the prejudice or injury of the neighboring owner, any more than one above or below can do the same? Contiguity does not give such right in the one case more than the other. Nor is it any answer to say, without such right the water would often be useless. So it would to riparians above or below. Their situation is often their misfortune. Voluntarily assumed, it can give them no right to shift it upon their neighbor. In our case, the record shows that the defendants once owned all the shoal, but sold it to plaintiff, so as to give him control of the shoal. Again, if it is true, that each riparian owner owns to the middle of the stream, by the same title he owns the bank or meadow, by what rule of reason can another come upon his half of the stream, and do him an injury with impunity, when he dare not pluck a blade of grass, or cut a sapling upon the bank? It is not true that the thread of the stream is his boundary, if this can be done.

Again, it is not true that by the common law property may be held in an incorporeal right or franchise, if such property cannot be held under the protection of the law in water power, commonly called mill privileges. The Court below in effect decided that such franchises are not entitled to protection, unless they could found their claim on prior use or occupancy. Can such a principle be based in reason? As well might an adjoining owner occupy his neighbor's wild land, and defend himself upon the plea that he was the first occupier. There are, however, some very respectable authorities which sanction the decision of the Court below.

Having briefly shown that they are not founded in reason, I respectfully take leave now to show they are unfounded in law.

"*Aqua curret, et debit currere*," is the language of the common law. Water flows, and should be suffered to flow, in its natural course, so that all, through whose land it flows, should have the privilege of using it. *Angell on water courses*, 11. And this privilege is usufructuary, and consists in the use both of the fluid and its impetus. *ib.* 11, 12. *Tyler et al. vs. Wilkinson*, 4 *Mason R.* 400. *McCalment vs. Whitaker*, 3 *Rawles R.* 84. *Vandenbergh vs. Van Bergen*, 13 *J. R.* 212. And Justice *Story* says, "*Prima facie*, every proprietor upon a bank of a stream owns the land covered with water, in front of his bank, to the middle thread of the stream; *usque filum aquæ.* In virtue of this ownership he has

a right to the use of the water flowing over it, in its natural current, *without diminution or obstruction.*" 4 *Mason R.* 400. Again he says, " There may be, and there must be allowed, of that which is common to all, a reasonable use. The true test of the principle, and extent of the use, is whether it is to the injury of the other proprietors or not." 4 *Mason R.* 401. But the Court below denied us the right to apply this test. He refused to permit us to prove that defendants so used their privileges as to injure us.

Again, Judge *Story* remarks, " But of a thing common by nature, there may be an appropriation by general consent or grant. Mere priority of appropriation of running water, without such consent or grant, confers no exclusive right. It is not like the case of mere occupancy, where the first occupant takes by force of his priority of occupancy. That presupposes no ownership already existing, and no right to the use already acquired. But our law annexes to the riparian proprietors the right to the *use,* in common, as an incident to the land ; and whoever seeks to found an exclusive use, must establish a rightful appropriation, in some manner known and admitted by the law. This may be either by grant from all the proprietors whose interest is affected by the particular appropriation, or by a long exclusive enjoyment without interruption, which affords a just presumption of right. 4 *Mason R.* 401–2.

That one riparian proprietor has not the right, except by grant, or consent, or presumption of grant, to increase or diminish the water beyond the line of his boundary, to the prejudice or injury of any other riparian owner, see further, *Angell* 14. 2 *Caines R.* 87. 1 *Paige R.* 448. 13 *J. R.* 217. 9 *Pick. R.* 528.

The Supreme Court of New York say, in *Vandenburgh vs. Van Bergen,* " The grant of an undivided shoal in a stream of water, would not authorize the grantee to appropriate or modify the stream to the injury of others, who have a joint interest in it ; the property in a stream of water is *indivisible.* The joint proprietors must use it as an entire stream, in its natural channel. 13 *J. R.* 217.

That prior occupancy of itself gives no right to running water, unless long enough to presume a grant, see *Angell* 21. 27 *Eng. Com. L. R.* 11—492. 23 *ib.* 76. 25 *ib.* 526. 4 *Mason R.* 401. 3 *Caines Ca.* 397. 15 *J. R.* 213. 17 *ib.* 306.

This position has been denied, not only by the Court below in

this cause, but the point involved has been a vexed question, both in America and England, until very lately. Indeed, some very respectable authorities, English and American, sustain the decision of the Court below. I will endeavor to show that they have been overruled as erroneous by the highest authority.

In England the law upon this question was most ably vindicated by Chief Justice *Denman,* in the late case of *Mason vs. Hill,* 5 *Bar. & Adol.* 1. (27 *Eng. Com. L. R.* 11,) a case several times before then discussed and decided, and most obstinately and ably debated for the defendant. The Chief Justice says, "The position that the first occupant of running water for a beneficial purpose, has a good title to it, is perfectly true, in this sense, that neither the owner of the land below, can pen the water back, nor the owner of the land above, divert it to his prejudice. In this, as in other cases of injuries to real property, possession is a good title against a *wrong doer.* But it is a very different question, whether he can take away from the owner of the land below one of its *natural* advantages, *which is capable of being applied to profitable purposes,* (and generally increases the fertility of the soil, even when unapplied) and deprive him of it altogether, by anticipating him in its application to a useful purpose. If this be so, a considerable part of the value of an estate, which in manufacturing districts particularly, is much enhanced by the existence of an unappropriated stream of water, with a fall within its limits, might at any time be taken away."

He then proceeds to remark, that such a doctrine has originated in a mistaken view of the principles laid down in the cases of *Bealy vs. Shaw,* 6 *East,* 208. *Saunders vs. Newman,* 1 *B. & A.* 258. *Williams vs. Moreland,* 2 *B. & C.* 913. *Liggins vs. Inge,* 7 *Bing.* 692. *Coxe vs. Mathews,* 1 *Ventris,* 137. 2 *Black. Com.* 14—18.

The learned Chief Justice, after reviewing these authorities, and the authorities of the civil law, from whence is derived the common law upon this subject, sums up by saying, "From these authorities it seems, that the Roman law considered running water, not as a *bonum vacans* in which any one might acquire a property, but as public or common *in this sense only,* that all might drink it, or apply it to the necessary purposes of supporting life ; and that no one had any property in the water itself, except in that particular portion which he might have abstracted from the

stream, and of which he had the possession, and during the time of such possession only." Such, he declares, is the meaning of the term that running water is *publici juris.* "And it appears to us," he says, " that there is no authority in our law, nor as far as we know in the Roman law, that the *first occupant,* though he may be the owner of the land above, has any right, by diverting the stream, to deprive the owner of the land below, of the special *benefit and advantage of the natural flow* of the water therein."

It is laid down by Chief Justice Parker, in *Hatch vs. Dwight,* 17 *Mass. R.* 289, that " the owner of a mill-site, who *first occupies it* by erecting a dam and mill, will have a right to water sufficient to work his wheels, if his privilege will afford it, notwithstanding he may, by his occupation, render *useless the privilege* of any one above or below him on the same stream." The Supreme Court of Pennsylvania, in *Strictland vs. Todd,* 10 *S. & R.* 69, maintain the same doctrine; and others might be added, clearly sustaining the ruling of the Court below, if they were law. But at the same time, as Mr. Angell well remarks, "they would overturn the fundamental principles relating to running water, and all the leading cases respecting the usufructuary rights of riparian proprietors." *Angell,* 21. And the Supreme Court of New York, say, " To give such an extension to the doctrine of occupancy, would be dangerous and pernicious in its consequences." *Platt vs. Johnson,* 15 *J. R.* 213.

" Of a thing common by nature," says Judge Story, " there may be an appropriation by general consent or grant. Mere *priority of occupancy* of running water, without such consent or grant, confers no exclusive right. *Tyler vs. Wilkinson,* 4 *Mason's R.* 401.

But the defendant in error asks—and the Court below, when it repelled the evidence of damage, put the same question—shall the plaintiff, while he neglects to put to any valuable purpose, a privilege common to both, act the dog in the manger, and prevent the defendants in the enjoyment of a valuable privilege on their own land? Judge Story in effect has answered this question, where he says, " But if there should not be water enough for the progressive wants of all, the riparian proprietor should *reserve to himself the power* of future appropriation to his own exclusive use. But the presumption of an absolute and controlling power over the whole flow, in the riparian proprietor, as his wants or his will may influence his choice, would require the most irresistible facts to support it." 4 *Mason,* 404.

Hendrick *vs.* Cook.

The right or property, which the plaintiff in error complains the defendants have deprived him of, is an incorporeal right, or franchise, commonly called "a water power," and the best authorities say that it consists of the difference of level between the surface where the water first touches his land, and the surface where it leaves it.   *Angell*, 12.   *M'Calmont vs. Whitaker*, 3 *Rawle's R.* 90.

That no riparian proprietor has a right to change or alter that level, to our prejudice or injury, whether he be above, below, or collateral, we refer to *Angell*, 12.   4 *Mason's R.* 400.   6 *East's R.* 206.   1 *Sim. & Stur.* 203.   23 *Eng. C. L. R.* 76.   27 *ib.* 11. 2 *Dev. & Bat.* 50.   13 *Mass.* 507.   13 *J. R.* 217.

As the plaintiff was not in the immediate use of this franchise, or "difference of level," its value consisted mainly, in its prospective worth, when the plaintiff might either wish to appropriate it to machinery, or to sell it with the land on which it is situated. The effort, therefore, which he made in the Court below, was not to prove an immediate injury, but a prospective or future damage, and which the Court prohibited.   That the Court herein erred, and that we were entitled to prove prospective or future damage, although we had sustained none *in presenti*, we refer to *Angell*, 70, 71.   9 *Saunders' R.* 175.   *Cross vs. Lewis*, 2 *Barn. & Cr.* 686. 9 *Eng. Com. L. R.* 223.   *Wells vs. Pearcy*, 27 *Eng. C. L. R.* 492,. *Whipple vs. The Cumberland Manufacturing Co.* 2 *Story's R.* 664, *McCalmont vs. Whitaker*, 3 *Rawle's R.* 90.   *Angell*, 170, 171.

"The plaintiff's premises," says Chief Justice Tindal in *Wells vs. Pearcy*, "would *sell for less* whilst the tunnel is in existence, if now put up to sale."   The voluntary suspension, by the plaintiff of his exercise and enjoyment of a right, says he, can form no justification to the defendants for preventing him from the possibility of enjoying it.

In respect to the right of the plaintiff to maintain the present suit, says Judge Story, in *Whipple vs. Cum. Man. Co.*, it is not indispensable for him to show that the water is flowed back by the defendants, so as actually to obstruct and stop the operation of his mill.   Indeed, continues the Judge, the principle of law goes much further; for every riparian proprietor is entitled to have the stream flow in its *natural channel, as it has been accustomed to flow*, without any obstruction by any mill, or a riparian proprietor below, on the same stream, unless the latter has acquired such a

right, by long use, or by purchase, or in some other mode which the law recognises as conferring a title on him. And if any mill or riparian proprietor below, on the same stream, does, without any such title, undertake to *obstruct*, or *change the natural stream*, then, although the riparian proprietor above cannot establish in proof, that he has suffered any substantial damage thereby, still he is entitled to nominal damages, as it is an invasion of his rights, and would, if acquiesced in, make the *tort* thus done to him, ripen into a right against the party. In short, that wherever a wrong is done to a right, the law imports that there is some damage to the right, and in the absence of any other proof of substantial damage, nominal damages will be given in support of the right. 2 *Story's R.* 664, 665.

The Court further decided that in such actions, the plaintiff was entitled to recover, as damages, counsel fees and other expenses incurred in vindicating his right.

We therefore maintain, from authority, that the plaintiff may sustain his action and recover, although he prove no specific injury or damage, if he prove his right has been infringed, so as to prevent a wrong ripening into right. That there exists a right, and that such a right has been invaded, is sufficient. And if an action should be delayed until actual damage could be proved, the defendant, by repeated invasions, might himself acquire a title which could not be successfully opposed, is the language of *Mr. Angell*, 170, 171, and many other authorities. See *Wells vs. Pearcy*, 27 *Eng. C. L. R.* 492. *Wells vs. Watling*, 2 Bl. R. 1233, and note. 1 *Wm. Saund. R.* 346. *Webb vs. The Portland Man. Co.* 3 *Sumner's R.* 196. *Whipple vs. The Cum. Man. Co.* 2 *Story's R.* 664–5.

That an incorporeal right or mill privilege in water power, is as much property, and as much under the protection of the law as any other right, see 3 *Summ. R.* 194. *Asby vs. White*, 2 *Lord Ray.* 938. *Smith's Lead. Ca.* 165. 3 *Rawle's R.* 90.

That such right or franchise, does not depend for protection on the erection of a mill, or other exercise or use of it, but is equally under the protection of the law, like other property, whether in use or not, see *Angell*, 25, 26. 1 *Saund. R.* 346. 27 *Eng. C. L. R.* 492. 3 *Summ. R.* 193. 2 *Stor. R.* 665. 3 *Rawle's R.* 90.

The consequence of these general principles, applicable to all riparian proprietors, is, says *Mr. Angell*, 13, that "where a river divides two estates, the owner of neither can carry off any part

of the water, without the consent of the opposite riparian owner," and by parity of reason, he can not increase or obstruct the water.

The demurrer of the defendants to the plaintiff's declaration, in the court below, puts their defence on the ground that they are tenants in common with the plaintiff. Doubtless the learned counsel who thus demurred, did it without reflection. They are nothing more nor less than riparian proprietors. They doubtless have a right to the use of the water in the stream, as it flows in its natural channel, in common with the plaintiff, but this does not constitute them tenants in common. They have no other or greater rights in the stream, as riparian owners opposite to the plaintiff, than they would have if such owners were above or below, see 13 *J. R.* 212. *Mason's R.* 397 *to* 413. 3 *Sumn. R.* 189. In either case they are entitled to the common use of the water, as it flows upon or by their land, in its natural channel, and in neither case can they encroach beyond the plaintiff's line, whether within or out of the channel. The Court below seemed to sanction the idea conveyed in the demurrer, by holding that the channel of the stream, and not the *use* of the water, was common to each. This is in no case true, except in navigable rivers; and then they are common to all only as public highways. But even if they were tenants in common, their demurrer would not present a valid defence, for all the authorities hold that one joint tenant, or tenant in common, may have an action against his co-tenant, for disturbance of the common right, or for wrongful ouster.

The record shows that by a former recovery, plaintiff had finally settled in his favor all the questions here in judgment, and had he not waived it in the court below, that recovery would be an effectual estoppel to any further discussion of those questions any where, between the same parties, so long as that recovery stands unreversed and unimpeached. But as it was not interposed, and insisted on below, it cannot be here. And perhaps it is well that these important questions should be thus early settled by this Court.

*By the Court*—WARNER, J. delivering the opinion.

This was an action of trespass on the case, for backing the water in the Tussehaw Creek, by means of a dam erected by the defendants, whereby the plaintiff's mill shoal was overflowed.

The plaintiff and the defendants are riparian proprietors, the plaintiff owning the land on one side of the Creek, and the de-

fendants on the other side, where the shoal, alleged to have been overflowed, is located. The defendants erected a mill-dam on the Creek below the shoal, on their own land, they being the owners of the land on both sides of the Creek, at the place where the dam is built. The dam, however, raises the water in the natural channel of the stream, and throws it back on the shoal, to the depth of ten or eleven inches; that is, the water in the natural channel of the creek, where the plaintiff and defendants are riparian proprietors, is raised by means of the dam, ten or eleven inches above the natural flow and current of the water in the stream, as it was wont to flow, before the erection of the dam by the defendants. On the trial of the cause, the plaintiff offered testimony, to prove the value of the plaintiff's mill-shoal when not overflowed, and its present value; also, the plaintiff offered to prove on the trial, what the value of the shoal was, previous to the erection of the defendant's dam, and what was the value of it when the witness saw it; and that the effect of the back-water on the shoal, was to render it *valueless* to the plaintiff. The plaintiff, also, offered to prove on the trial, how much the plaintiff had been *damaged* by the obstruction of the water on his mill-shoal; which testimony, so offered, was rejected by the Court, on the ground, as we understand from the record, that the defendants, by their dam, had not thrown the water out of the natural channel of the creek, and consequently the plaintiff was not entitled to recover damage; to which decision of the Court the plaintiff excepted.

After stating the facts of the case, the Court below charged the jury that "the plaintiff is not entitled to any damage for simply raising the water in the natural channel of the stream, so long as the water continues to be confined by its banks to the natural channel; but if, by raising the water by a dam upon his own land, he throws the water out of the natural channel of the stream, the party whose land is overflowed, is entitled to damage. You will, therefore, enquire whether the defendants have, by their dam, thrown back the water, and whether it has been thus thrown out of the natural channel, upon the land of the plaintiff; if so, the plaintiff is entitled to recover." To which charge of the Court the plaintiff excepted. The error assigned is based mainly on the two foregoing exceptions, although there are other exceptions to the rejection of testimony, apparent on the face of the record, but which were not insisted on in the argument before this Court;

our judgment will therefore be confined to the points made and urged on the argument growing out of the assignment of errors, predicated on the foregoing exceptions.

[1.] What are the rights and privileges of riparian proprietors of lands, bordering on streams, above the ebb and flow of tide water ?   When there are two opposite riparian proprietors, each owns that portion of the bed of the river or creek, which is adjoining his land, *usque ad filum aquæ,* or in other words, to the thread, or central line of the stream; and if hydraulic works be erected on both banks, each is entitled to use an equal share of the water.   The water can only be used by each as an entire stream in its *natural channel*; for, of the property in the water, there can be no severance. *Angell on Water Courses,* 4. *Arthur vs. Case,* 1st *Paige's Rep.* 447. *Vanderberg vs. Van Bergen,* 13th *John, Rep.* 217. *Exparte Jennings,* 6th *Cowen's, Rep.* 518. *And see the valuable note on page* 536.   Every proprietor of lands, says Chancellor Kent, on the banks of a river, has, naturally, an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run, (*currere solebat,*) without *diminution or alteration.*   No proprietor has a right to use the water, to the *prejudice* of other proprietors, above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment.   He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debet currere,* is the language of the law.   Without the *consent* of the adjoining proprietors, he cannot divert or diminish the quantity of water, which would otherwise descend to the proprietors below, *nor throw the water back* on the proprietors above, without a grant or an uninterrupted enjoyment of twenty years, which is evidence of it. 3*d Kent's Com.* 439. *In Wright vs. Howard,* 1st *Sim. and Stuart's Rep.* 190, Sir John Leach states the law which governs the rights of riparian proprietors, with great force and accuracy. "*Prima facie,* (says the learned judge,) the proprietor of each bank of a stream is the proprietor of half the land covered by the stream; but there is no property in the water.   Every proprietor has an *equal* right to use the water which flows in the stream; and, consequently, no proprietor can have the right to use the water to the *prejudice* of any other proprietor, without the consent of the other proprietors, who may be affected by his operations; no proprietor can either diminish the quantity of wa-

ter, which would otherwise descend to the proprietors below, nor *throw the water back on the proprietors above.* Every proprietor who claims a right, either to *throw the water back above,* or to diminish the quantity of water which is to descend below, must, in order to maintain his claim, either prove an actual grant or license from the proprietors affected by his operations, or must prove an uninterrupted enjoyment of twenty years, which term of twenty years is now adopted upon a principle of general convenience, as affording conclusive presumption of a grant." In *Mason vs. Hill,* 27*th English Com. Law Rep.* 22, the case of *Wright vs. Howard* is cited with marked approbation by Chief Justice Denman, who delivered the judgment of the Court of King's Bench, and who refers to it as the *"luminous judgment"* of the Master of the Rolls. The plaintiff, then, as the riparian proprietor, was the owner of the land to the middle or centre of the Tussehaw Creek, including the shoal. One half of the land covered by the water of the creek, as it was wont to flow in its natural channel, including the shoal therein, was the *separate* property of the plaintiff; the defendants, as riparian proprietors, being entitled to the other half, in like manner as the plaintiff. Each proprietor of the land on the banks of the creek, has a natural and equal right to the use of the water which flows therein as it was *wont to run,* without diminution or alteration. Neither party has the right to use the water in the creek, to the *prejudice* of the other. The plaintiff cannot divert or diminish the quantity of water which would naturally flow in the stream, so as to prejudice the rights of the defendants, without their consent; nor can the defendants, without the consent of the plaintiff, throw the water back upon him to his injury, for it is his *right* to have the water run in the channel of the stream as God made it to run.

[2.] Each riparian proprietor is entitled to a reasonable use of the water, for domestic, agricultural and manufacturing purposes; provided, that in making such use, he does not work a material *injury* to the other proprietors. The defendants have appropriated the water for the use of their mill on their own land, and the question is, whether they have done so, without *injury* to the legal rights of the plaintiff. The record shows, that the water in the channel of the creek, along which the plaintiff and defendants are riparian proprietors, is raised by the defendant's dam

Hendrick *vs.* Cook.

ten or eleven inches above its natural level, and that the plaintiff's mill-shoal is drowned to that extent. Does the law, independent of proof of *special damages*, (for we will now consider the question independent of the proof offered to shew damages,) give the plaintiff a right of action against the defendants?

The plaintiff, as we have already shown, is the owner of the land bordering upon, and to the centre of the stream, including half the mill shoal. It is *his property*, and he has the indisputable right to enjoy it, and to appropriate it to *any use* he may think proper, not inconsistent with the rights of others; it is a part of his *freehold estate*. Have the defendants the legal right, as *riparian proprietors*, to throw the water back upon the plaintiff in the channel of the creek, and thus convert a running stream into a stagnant pool, by means of the erection of their dam, although the water is not thrown out of the natural banks of the stream? We think they have not such right, either upon principle or authority. It is true, a riparian proprietor has the right to use the water in the stream, as it was wont to flow, but he has no right to use it in such manner as to alter or change the flow or current of the stream, to the *injury* of another proprietor. The principle of the Common Law is, that a man must so use his own as not to injure others. " *Sic utere tuo ut alienum non lædas.*"— As the owner of the land to the middle of the stream, the plaintiff has the right to the middle of the shoal to that extent, with the water running over it as it was wont to run, in its natural state ; and when the defendants, by their dam, prevent it from so running, they deprive him of a *right* which the law gives him. The plaintiff has the *right* to use the bank of the stream, down to the water, in its natural current, for *every lawful* purpose; he has the right to have the water flow over his shoal, and along the channel of the stream, in its natural course ; he has the right to erect his dwelling house on the bank of the stream, and enjoy the pleasure of seeing the water flow rapidly over its shoaly · bed.— The plaintiff has the right to the enjoyment of all the springs which may issue from the bank of the stream, between the water in its natural current, and where it is overflowed in consequence of the defendant's dam. He is also entitled to all the marl and minerals which may be found there—and he has the right to examine there for such objects, if he thinks proper to do so ; but the defendants, by means of their dam, prevent the water from

flowing in its natural course; they cause the water to overflow a portion of *his soil*, by raising the water ten or eleven inches within the banks of the stream—they render the bank of the stream unfit for the erection of a dwelling, by creating a stagnant pool, for the generation of poisonous reptiles and noxious insects—they have, by means of their dam, *invaded his property* and deprived him from exercising dominion over it, and enjoying it in as full and ample manner as of right he is entitled to do; and they do this without any pretended license or authority from the plaintiff, whose rights are thus invaded. In the case of *Webb vs. The Portland Manufacturing Company*, 3 *Sumner's Report*, 189, Mr. Justice Story, after reviewing the authorities as to the rights of riparian proprietors, says : " The same principle applies to the owners of mills on a stream. They have an undoubted right to the flow of the water, as it has been accustomed of right, and naturally to flow, to their respective mills. The proprietor above has no right to divert, or unreasonably to retard this natural flow to the mills below ; and no proprietor below, has a right to *retard* or *turn it back* upon the mills above, to the *prejudice of the rights* of the proprietors thereof. This is clearly established by the authorities already cited; the only distinction between them being, that the right of a riparian proprietor arises by mere operation of law, as an incident to his ownership of the bank—and that of a mill-owner, as an incident to his mill." Our judgment, therefore, is, that the defendants, as *riparian proprietors*, have not the right, by the erection of the dam on their own land, to raise the water in the channel of the creek, so as to drown the plaintiff's shoal in the manner stated in the record. *Tyler vs. Wilkerson*, 4 *Mason's Rep.* 397. *Blanchard vs. Baker*, 8 *Greenleaf's Rep.* 253. *Omelvany vs. Jaggers*, 2 *Hill's S. Carolina Rep.* 634. *Pugh vs. Wheeler*, 2 *Dev. & Battle Rep.* 50.

[3.] Have the defendants the right to throw back the water on the plaintiff's shoal, on the ground of prior occupancy? It was urged on the argument, that the defendants having first appropriated the water by building their mill, had the right to water sufficient to work their wheels ; notwithstanding they might by such appropriation and occupation, render useless the privilege of any one above or below them, on the same stream, and there is some *dicta* and authority in the books, which go to that extent. The case of *Hatch vs. Dwight et al*, 17 *Mass. Rep.*

289, is one. If, however, this should be held to be the law, it would, in our judgment, as stated by Mr. Angell, overturn and throw to the ground the fundamental principles relating to running water and all the leading cases respecting the usufructuary rights of riparian proprietors. *Angell on Water Courses,* 22. Why should a riparian proprietor, because he has a reasonable use of the water as it flows in the natural current of the stream, be allowed to trespass on the property of another, by throwing the water back upon his mill or shoal, and thereby render it valueless to the owner? Upon what principle, either of law or morals, can such a right be maintained? Certainly not on the ground of his being a riparian proprietor, for we have already shewn, in that character, he has no right to use the water to the *prejudice* of another proprietor.

If this principle can be maintained, then, the defendants as riparian proprietors, can by their own act of appropriating the water first, to the purposes of their mill, wholly defeat and destroy the right of the plaintiff to his shoal as a riparian proprietor; his title to this valuable species of property, is made dependent on the act and will of the defendants. They first appropriate the water in the stream, and flow it back on the land of the plaintiff, and after the expiration of seven years, the period prescribed by the Statute of Limitations, they will acquire a *prescriptive* right to throw back the water on the plaintiff's land, and thus his title to his property, is entirely defeated and destroyed.

The throwing back the water upon the proprietor above, by the proprietor below, is a violation of the fundamental principles of the law, which govern the rights of riparian owners; and prior occupation does not authorise the defendants so to use the water as to *prejudice* and destroy the rights of the plaintiff to his property. The act of throwing back the water on the property of the plaintiff is a wrong—an act of *usurpation* on the part of the defendants, and *usurpation* does not justify itself. This question, however, has been thoroughly discussed and settled, both in the English and American Courts—that occupancy, without grant or license, gives no right to divert or throw back the water in the stream, to the *prejudice* of other proprietors, unless such occupancy has existed for a period of time which would give the occupant a prescriptive right, under the statute of limitations. *Mason vs. Hill, et al* 27 *English Com. Law Rep.* 1. *Platt vs. John-*

*son,* 15 *John. Rep.* 213. *Merritt vs. Brinkerhoff,* 17 *John. Rep.* 320. *Tyler vs. Wilkinson,* 4 *Mason's Rep.* 401. *Pugh vs. Wheeler,* 2 *Dev. & Battle's Rep.* 50. *Omelvany vs. Jaggers,* 2 *Hill's Carolina Rep.* 634.

[4.] Let us examine more closely, the right of the plaintiff to recover damages of the defendants in this action, for this *invasion of his right.* Trespass on the case, is an action for the recovery of damages, for acts unaccompanied with force, and which in their consequences only are injurious; for though an act may be in itself lawful, yet, if in its effects or consequences, it is productive of *any injury* to another, it subjects the party to this action: as where the defendant put up a spout on his own premises, which was an act lawful in itself, but when it produced an *injury* to the plaintiff, by conveying the water into his yard, trespass on the case was adjudged to lie, for such consequential injury. 2 *Espinasse,* 598. I find one case reported in 1 *Richardson's Rep.* 445, *Garrett vs. McKie,* in which the majority of the Court held, that an action on the case by one riparian proprietor, of an unnavigable stream, against another, for erecting a dam on the stream, whereby the water in the channel of the creek, is raised along the plaintiff's land, above its natural level, cannot be sustained, without proof of *special damage.* Mr. Justice O'Neal, who delivered the judgment of the Court in that case, concedes that in cases for throwing back water in the *channel of a stream,* the party claiming to recover, may state and prove some *special injury* resulting from it—" Such as deepening and rendering dangerous a ford which he was accustomed to use, or *drowning a shoal which might be useful as a site for machinery,* or preventing or retarding the operation of a mill or other machinery." The position maintained by the Court in that case is, that the flowing back the water in the natural channel of the creek, is not *per se* actionable in law, without proof of some *special damage* sustained by the plaintiff.

The very high respect entertained for that Court, has induced us to examine this question more fully than we otherwise should have done ; and yet, we have not been able to bring our minds to the same conclusion. We concur in opinion with Mr. Justice Evans, who dissented from the judgment of the Court, that the overflowing of the land of a riparian proprietor, within the banks of the stream, is an *injury* to the *rights* of the party whose property is so overflowed, for which the law will imply damage, and give

a right of action. The law, as we have already seen, prohibits one riparian proprietor from throwing back the water in the channel of the stream, to the *prejudice* of the rights of another. Whenever the Common Law gives a *right* or prohibits an *injury*, it also gives a *remedy*, by action. 3 *Bl. Com.* 123. But it is said, there must be some *perceptible damage* shown, to entitle the plaintiff to recover; that injury without damage, is not actionable. The reply to that argument is, that the act of the defendants throwing back the water on the plaintiff's land, in the stream, is an *invasion of his right* to exercise the control and dominion over his property—and according to our understanding of the principles of the Common Law, whenever there has been an illegal invasion of the *rights* of another, it is an *injury*, for which he is entitled to a remedy by an action. There does exist a class of cases to which the maxim, *damnum absque injuria*, may properly be applied, but they are not such as where there has been a *direct invasion* of personal rights, or the rights of property.

Where a man sets up a *new mill* or *school,* in the neighborhood of an *ancient* one, an action will not lie, though a damage may thence accrue to the former mill or school; for such rivalship is of public benefit and advantage, and it is *damnum absque injuria.* 2 *Espinasse,* 642. The Common Law gives a prompt and efficient remedy for the redress of *all* wrongs and injuries, to the person and property of the citizen, so as to preserve the peace and harmony of society, and thereby prevent a resort to force. Every man should know and feel, that *all* his rights are under the *protection of the law.* In *Ashley vs. White,* 2 *Lord Raymond,* 953, Lord Holt said, " If the plaintiff has a *right,* he must of necessity have a means to vindicate and maintain it, and a *remedy,* if he is injured in the enjoyment of it; and indeed, it is a vain thing to imagine a *right* without a *remedy* ; for want of right and want of remedy are reciprocal."

In *Hunt vs. Denman, Croke Jac.* 478, the lessor brought an action against the lessee, for disturbing him from entering into the house leased, in order to view it and to see whether any waste was committed : and it was held that the action will lay, though no waste was committed, and no *actual damage* done ; for the lessor had a *right* so to enter, and the hindering of him was an injury to *that right,* for which he might maintain an action. So in *Wells vs. Watling,* 2 *Black. Rep.* 1238, where the plaintiff

brought his action for a surcharge of his Common ; it was held, he need not show that he had actually turned any cattle on the Common, at the time of the surcharge laid : it is sufficient to show, that by the number turned in by defendant, he could not have enjoyed his Common in so *ample manner as he was entitled.* In *Patrick vs. Greenway*, cited by Mr. Sergeant Williams, 1 *Saunders' Rep.* 346, which was an action for fishing in the plaintiff's several fishery, it appeared in evidence, that the defendant fished there, but did not take any fish—neither was it alleged in the declaration, that the defendant caught any fish—the plaintiff obtained a verdict, which the defendant moved to set aside, but the Court refused even a rule to shew cause, upon the ground, that the act of fishing was not only an infringement of the plaintiff's *right*, but would hereafter be evidence of an using, and exercising of the right by the defendant, if such an act were overlooked.

In *Hobson vs. Todd*, 4 *Term Rep.* 73, which was an action on the case for surcharging the Common, Butler, J. said, " the only question then is, whether *any* injury has been done by the defendant, to the plaintiff. Here he is a wrong-doer, and the plaintiff is entitled to an action, *without proving any specific damage.* There is also another ground on which this action may be supported, which is, the *right* has been injured, and if a commoner cannot bring such an action as this, because his cattle had grass enough to prevent them from starving, he must permit a wrong-doer like the defendant, to gain a right by the length of possession." If there had been no *perceptible damage* done the plaintiff, by the defendants throwing back the water upon his land, and shoal, in the channel of the creek, there was an *injury* done to his *right*, and shall the defendants, as wrong-doers, be permitted to acquire a prescriptive title, to enjoy the plaintiff's property, for their own benefit, under the statute of limitations ? In the great case of *Millar vs. Taylor*, 4 *Burrow's Rep.* 2344, Mr. Justice Aston cites a case from the year book of 12th Henry VIII, in which there was a great dispute, whether an action would lie for taking away a bloodhound, whether it was to be considered as *property.* It was argued, the dog was of *no value*, nor *profit*, but for *pleasure* ; that felony could not be committed of it, consequently *not trespass;* that a dog was not *titheable*, &c. But upon what principles, asks Mr. Justice Aston, did the Court determine the action lay ? Upon these—" That where *any wrong* or *damage* is done to a man, the

*law gives him a remedy :* that if it was only a thing for pleasure; yet, it was *sufficient;* as a *popinjay,* which sings and refreshes my spirits; that it was *not lawful* to take him against my will." After reviewing the cases, that learned Judge says—"the Common Law being founded on such principles as have been laid down, and which are avowed by the above authorities, the remedy by action upon the case is suited to *every* wrong and grievance that the subject may suffer, from a *special invasion of his right.*" In *Omelvany* vs. *Jaggers,* 2 *Hill's Rep.* before cited, Chancellor Harper says : " It may be observed, that water cannot be thrown back on the land of the proprietor above, without overflowing his soil; and though the water still remain within its natural channel, being only raised to a greater height upon the banks; yet, still it is in strictness *an invasion of the proprietor's soil,* over which, on general principles of law, he has the exclusive right of dominion.'"

In *Bowen* vs. *Hill,* 27 *Eng. Co* the defendants erected a bridge and tunn own cross a navigable drain, which passed from the river Nene through the defendants' close up to the close of in above the obstruction erected by the defendant had been so obstructed by the accumulation of mud in it, no barge could pass along it, and the plain had not, could not use it. The Court held, however, that it was the *right* of the plaintiff to navigate it, provided he should think proper to remove the mud, and that the *voluntary* suspension by the plaintiff, of the exercise and enjoyment of a *right,* did not form any justification to the defendant for preventing him from the *possibility* of enjoying it. Although the plaintiff had not sustained any *specific damage* by the obstruction erected by the defendant; yet he *invaded the plaintiff's right;* and the Court held he was entitled to recover nominal damages for the protection of *that right;* otherwise his right might be entirely destroyed by lapse of time, and the defendant acquire a right by his *adverse enjoyment.*

In *Webb* vs. *the Portland Manufacturing Company,* 3 *Sumner's Rep.* 192, Mr. Justice Story discusses the question of *injury without damage,* in so clear and satisfactory a manner, that we feel entirely persuaded that all who love and reverence the principles of the common law, will be gratified to see them vindicated and maintained by one whose profound learning and wisdom in his profession has commanded the universal ap-

probation of his countrymen. Speaking with regard to the diversion or obstruction of water in a stream, he says: " As to the first question, I can very well understand that no action lies in a case where there is *damnum absque injuria*, that is, where there is a damage done without *any wrong*, or *violation of any right of the plaintiff*. But I am not able to understand how it can correctly be said, in a legal sense, that an action will not lie, even in case of a wrong or violation of a right, unless it is followed by some *perceptible damage* which can be established as a matter of fact ; in other words, that *injuria sine damno* is not actionable. On the contrary, from my earliest reading, I have considered it laid up among the very elements of the common law, that wherever there is a *wrong*, there is a *remedy* to redress it; and that *every injury* imports *damage* in the nature of it; and if no other damage is established, the party injured is entitled to a verdict for nominal damages. *A fortiori*, this doctrine applies where there is not only a violation of a right of the plaintiff, but the act of the defendant, if continued, may become the foundation, by lapse of time, of an adverse right in the defendant; for then it assumes the character, not merely of a violation of a right, tending to diminish its value, but it goes to the absolute destruction and extinguishment of it. Under such circumstances, unless the party injured can protect his right from such violation by an action, it is plain that it may be lost or destroyed without any possible remedial redress. In my judgment, the common law countenances *no such inconsistency* ; not to call it by a stronger name. Actual perceptible damage, is not indispensable as the foundation of an action. The law tolerates no further inquiry, than whether there has been the *violation of a right ;* if so, the party injured is entitled to maintain his action for nominal damages, *in vindication of his right,* if no other damages are fit and proper, to remunerate him.

The plaintiff, however, as it appears by the record, offered to prove the value of the shoal, before is was submerged by the backwater thrown upon it in consequence of the defendants' mill-dam and its value in its submerged condition ; also offered to prove the *damage* done the plaintiff's mill-shoal in consequence of the back-water, which evidence so offered, was rejected by the Court. We are of the opinion, that the evidence offered to prove the damage sustained by the plaintiff, ought to have been admitted, as

the verdict of the jury must necessarily be regulated by the extent to which the property of the plaintiff was damnified, by throwing the water back upon his shoal by the dam of the defendants. Our judgment, therefore, is, upon the facts presented by the record in this case, that the plaintiff is the owner of the land to the centre of the Tussehaw Creek, as the same flows in its natural channel, which necessarily includes one-half of the mill-shoal situated therein; that the defendants, as riparian proprietors of the other side of the creek, have the right to a reasonable use of the water, as it flows along in the natural channel thereof, for domestic, agricultural and manufacturing purposes; provided, that in making such use, they do not *prejudice* or *injure* the rights of the plaintiff to his property.   The altering and obstructing the natural flow of the water in the channel of the creek, by means of the defendants' dam, whereby the water is thrown back upon the land and mill-shoal of the plaintiff *in the natural channel of the creek*, as stated in the record, is an injury to, and an invasion of the plaintiff's right of property to his land, bordering upon, and situated in the natural channel of the stream to the central line thereof; and that for such injury and invasion of the plaintiff's right of property, by the defendants, he is entitled to maintain an action against them, and to recover nominal damages for the protection of that right, if no perceptible damage shall be proved on the trial; that prior occupation of the water by the defendants, does not give them the right, either to divert the water from the plaintiff's land in the natural channel of the stream, or to throw the water back upon his land therein, without a grant or license from the plaintiff so to do, unless they have been in the peaceable enjoyment of the easement claimed, for a period of time, which would give them a right, under the Statute of Limitations, and that the testimony offered by the plaintiff to prove the *actual damage* sustained by him in consequence of throwing back the water upon his mill-shoal, ought to have been admitted; therefore,

Let the judgment of the Court below be reversed, and a new trial granted.