35615. PYLE v. GILBERT et al.
35616. DOSTER v. GILBERT et al.
35617. HILL v. GILBERT et al.
35618. EVANS v. GILBERT et al.
35619. BUCKHALTER v. GILBERT et al.

HILL, Justice.

This is a water rights case involving a non-navigable water-course. It presents a confrontation between the past and the present. Plaintiffs are the owners of a 140-year-old water-powered gristmill. They emphasize the natural flow theory. Defendants are upper riparians using water to irrigate their farms. They emphasize the reasonable use theory of water rights.

The plaintiffs, Willie and Arlene Gilbert, own property commonly known as Howard's Mill located on Kirkland's Creek, a non-navigable stream in Early County which goes into the Chattahoochee River. They acquired a partial interest in the property in 1974. The other interest was acquired at the same time by their daughter and son-in-law. In 1977, they purchased the other interest and now own the fee. Until August 31, 1978, the Gilberts owned and operated a water-powered grist-mill on their property. They also rented boats for profit and permitted fishing and swimming in the 40-acre pond. (On August 31, 1978, the mill was destroyed by fire.)

On July 7, 1978, the Gilberts filed a complaint against Sanford Hill,[1] who is an owner of property that is upper riparian in relation to the Gilbert's property,

---

[1]Sanford Hill and several others (who are not involved in this litigation) were the grantors of the property when it was conveyed in 1974.

alleging that since 1975 he has been diverting and using water from Kirkland's Creek for irrigation, and that he also has been trespassing and pumping water out of their millpond. This allegation of trespass by Hill for the purpose of taking water from the pond apparently was not pursued by the Gilberts. The Gilberts characterized Hill's diversion of waters from Kirkland's Creek for irrigation as both a nuisance and a trespass and sought injunctive relief as well as actual and punitive damages and attorney fees.

The testimony at a hearing on July 18, 1978, revealed to plaintiffs that other upper riparian owners also had irrigated with water from the creek. The plaintiffs subsequently added four defendants: George Edgar Pyle, Jimmy Doster, Philip Buckhalter and Vinson Evans.[2] Following discovery, the trial court made an extensive examination of our water law and granted the plaintiffs' motions for summary judgment as to liability against all defendants, holding that the defendants' use of the water for irrigation constituted a diversion, a trespass, a nuisance and an unreasonable use as a matter of law, and enjoining any future use.[3] The issue of damages was reserved for trial. The defendants appeal.

1. Over 100 years ago, when this court first considered riparian rights in *Hendrick v. Cook,* 4 Ga. 241

---

[2]Vinson Evans owns non-riparian property which he admits having irrigated with the alleged permission of a riparian owner. The evidence does not show that he owns any riparian property. The second and fourth findings of fact by the trial court must be reversed to the extent that they imply he is an upper riparian landowner to the plaintiffs.

[3]The trial judge noted that the authorities point out conflicts as well as gaps in our water law. He observed that "Water rights are becoming more and more important with advancing techniques for its withdrawal and use, and there is a need for the courts or the legislature, or both, to further amplify and clarify equitable water rights between parties, particularly as those rights apply to irrigation."

(1848), several bedrock principles were established. First, the court firmly rejected the doctrine of appropriation and instead applied riparian principles to the dispute.[4] And in stating the principles of riparian rights, the court also adopted the doctrine of reasonable use. As stated by the court (4 Ga. at 256): "Each proprietor of the land on the banks of the creek, has a natural and equal right to the use of the water which flows therein as it was *wont to run,* without diminution or alteration. Neither party has the right to use the water in the creek, to the *prejudice* of the other. The plaintiff cannot divert or diminish the quantity of water which would naturally flow in the stream, so as to prejudice the rights of the defendants, without their consent. . . Each riparian proprietor is entitled to a *reasonable use* of the water, for *domestic, agricultural* and *manufacturing* purposes; provided, that in making such use, he does not work a *material injury* to the other proprietors." (Emphasis supplied.)[5] The court also held that an injury to one's riparian rights gave rise to an action for damages for trespass even in the absence of proof of actual damage.[6]

Subsequently, two statutes were enacted and codified in the Code of 1863. Section 2206 of the Code of 1863 appears today almost verbatim at Code § 85-1301: "Running water, while on land, belongs to the owner of the land, but he has *no right to divert it* from the usual channel, nor may he so use or adulterate it as to interfere

[4]In the continental United States, the eastern or "humid" states apply the doctrine of riparian rights with some legislative modifications, while the western or "semi-arid" states apply the doctrine of prior appropriation or hybrid riparian-appropriation doctrines. See 1 Clark, Waters and Water Rights 29-32, § 4.1 (1967).

[5]The facts in *Hendrick* involved raising the water level in the watercourse rather than diverting the water from the watercourse, but the court included diversion, albeit in dicta, in its discussion of riparian rights.

[6]Whether a per se violation will authorize an injunction where water is in short supply, and the lower riparian is not using it, we do not here decide.

with the enjoyment of it by the next owner." (Emphasis supplied.) (See also Code § 85-1305.) Section 2960 of the Code of 1863 now appears at Code § 105-1407: "The owner of land through which nonnavigable watercourses may flow is entitled to have the water in such streams come to his land in its natural and usual flow, subject only to such detention or diminution as may be caused by a *reasonable use* of it by other riparian proprietors; and the *diverting of the stream, wholly or in part,* from the same, or the obstructing thereof so as to impede its course or cause it to overflow or injure his land, or any right appurtenant thereto, or the pollution thereof so as to lessen its value to him, shall be a trespass upon his property." (Emphasis supplied.) The words "subject only to such detention or diminution as may be caused by a reasonable use of it by other riparian proprietors" first appear in the Code of 1933, § 105-1407, and appear to have been taken from *White v. East Lake Land Co.,* 96 Ga. 415, 416 (23 SE 393) (1895). See also *Pool v. Lewis,* 41 Ga. 162 (1) (1870).

Thus it is clear that under both court decisions and statutes, Georgia's law of riparian rights is a natural flow theory modified by a reasonable use provision. Kates, Georgia Water Law 1969, p. 63 (1969); Agnor, Riparian Rights in Georgia, 18 Ga. B.J. 401, 403 (1956). The reasons for the rule and its contradictory reasonable use provision were well stated by the court in *Price v. High Shoals Mfg. Co.,* 132 Ga. 246, 248-249 (64 SE 87) (1909): "Under a proper construction [of the pertinent Code sections], every riparian owner is entitled to a reasonable use of the water in the stream. *If the general rule that each riparian owner could not in any way interrupt or diminish the flow of the stream were strictly followed, the water would be of but little practical use to any proprietor, and the enforcement of such rule would deny, rather than grant, the use thereof.* Every riparian owner is entitled to a reasonable use of the water. Every such proprietor is also entitled to have the stream pass over his land according to its natural flow, subject to such disturbances, interruptions, and diminutions as may be necessary and unavoidable on account of the reasonable and proper use of it by other riparian proprietors. Riparian proprietors have a common right in the waters of the stream, and the necessities of the

business of one can not be the standard of the rights of another, but each is entitled to a reasonable use of the water with respect to the rights of others." (Emphasis supplied.)

In this case, the trial court found that irrigation with modern equipment was a "diversion" which is entirely prohibited by Georgia law, Code §§ 85-1301, 105-1407, supra; i.e., the trial court found that irrigation with modern equipment constituted a trespass as a matter of law. We disagree. The use of water for agricultural purposes was recognized as a reasonable use along with domestic use in the first reported Georgia case on riparian rights. *Hendrick v. Cook,* supra. We realize, of course, that irrigation was not involved in that case. We also recognize that "There does not seem to be a Georgia case dealing with the consumption of water for irrigation. . . It is generally stated that a reasonable amount of water may be diverted for irrigation, under the general right of use for domestic and agricultural purposes." Agnor, supra, 405-406; Kates, supra, 35-36; see also 1 Clark, Waters and Water Rights 373, § 54.3(F); see also 45 AmJur2d 951, 954, Irrigation, §§ 7, 14.

The first question, then, is whether the use of water for irrigation is a diversion under our laws and thus is prohibited. We find that it is not. When our riparian rights statutes were enacted, irrigation apparently was practiced only moderately here and in other "humid" states. Thus the General Assembly would not have contemplated prohibiting the use of water for irrigation in enacting these laws. This conclusion is buttressed by the absence of any litigation in Georgia on this topic. Additionally, the legislation largely tracks the case of *Hendrick v. Cook,* supra, and its progeny, and the court therein specified that a reasonable use of riparian water could be made for agricultural purposes. This use for agricultural purposes would have been primarily by some form of irrigation.

In prohibiting "diversion," Code §§ 85-1301, 105-1407, we do not find that the General Assembly intended to prevent the use of riparian water for irrigation, even though irrigation is accomplished by removing water from its natural watercourse. Rather we

think the General Assembly intended to prohibit the diversion of water from a watercourse for other purposes, such as to drain one's own property (see *Goodrich v. Ga. R. & Bkg. Co.,* 115 Ga. 340 (41 SE 659) (1902)) or to create a new watercourse on the diverter's property (see *McNabb v. Houser,* 171 Ga. 744 (156 SE 595) (1930)). That this latter use would have been of some concern to the General Assembly is evidenced by the adoption of the natural flow theory, which recognizes that the mere presence of a watercourse on one's property generally enhances it. Rest. Torts 2d, Chapter 41, Topic 3, Introductory Note, p. 212.

Finally, Georgia's Water Quality Control Act (Ga. L. 1977, p. 368) exempts farm uses, including irrigation, from its permit requirements. Code Ann. § 17-510.1. This, we think, is a legislative recognition that irrigation is not a prohibited "diversion" but is rather a permitted use where it is reasonable. See Code Ann. § 17-517. Hence we find that irrigation is not per se a diversion of water prohibited by law.

In sum, we find that the right of the lower riparian to receive the natural flow of the water without diversion or diminution is subject to the right of the upper riparian to its reasonable use (*Rome R. Co. v. Loeb,* 141 Ga. 202, 206 (80 SE 785) (1913)), for agricultural purposes, including irrigation.

2. In addition to holding that the use of water for irrigation was a prohibited diversion, the trial court also ruled that the uses at issue here were unreasonable as a matter of law. The trial court granted summary judgment as to liability based on several findings of fact as to which we find a conflict in the evidence.

First, the trial court made findings of fact as to the defendants' combined capacity to irrigate and actual volume of irrigation. These figures came from defendants' answers to interrogatories. Four of the defendants (all except Evans) stated they had used more than one piece of irrigation equipment. The trial court apparently added together the capacity of each item to determine total capacity, but the record shows that three defendants who used more than one unit did not use them in the same years; as to those pumps and travelers used by the

remaining defendant in conjunction with each other, their capacity would be the capacity of the less capable piece of equipment in the system, not the total of their capacities; and there is no evidence to support the finding that the five defendants' combined capacities were in use at any one time; i.e., these answers only stated the capacity of the equipment, not the dates. times or durations which it was operated. (F/F no. 9 and no. 10).[7]

Regarding the effect of the complained of irrigation, in light of the foregoing we find an issue of fact as to whether it substantially altered and diminished the natural flow of the stream. (F/F no. 4 and no. 5). Defendant Hill, who formerly operated the mill, testified that before the irrigation began the mill would at times be unusable due to a shortage of water. Thus we also find an issue of fact as to whether the normal and natural flow of the stream is sufficient and adequate to power the plaintiffs' grist mill at all times (F/F no. 6), as to whether the irrigation caused the mill to be shut down (F/F no. 7) and as to whether it was the cause of cessation of pond fishing and boating (F/F no. 8).

Finally, we do not find that the record supports the conclusion that the uses complained of were unreasonable as a matter of law. Whether the use of water for irrigation is reasonable or unreasonable presents a triable question. *White v. East Lake Land Co.,* supra, 96 Ga. at 417; *Price v. High Shoals Mfg. Co.,* supra, 132 Ga. at 249.[8] It was error to grant summary judgment to the plaintiffs.

3. In its detailed analysis of Georgia water law, the trial court had to apply *Hendrix v. Roberts Marble Co.,* 175 Ga. 389, 394 (165 SE 223) (1932), to the effect that ". . . riparian rights are appurtenant only to lands which actually touch on the watercourse, or through which it

---

[7]Defendant Pyle did apparently own several pieces of equipment at one time, but it was not shown that he used them simultaneously. Note: F/F refers to the trial court's findings of fact.

[8]See also *Burns & Ledbetter, Inc. v. Primark Marking Co.,* 244 Ga. 341, 343 (260 SE2d 58) (1979).

flows, and that a riparian owner or proprietor can not himself lawfully use or convey to another the right to use water flowing along or through his property. . ." Thus *Hendrix* held water could only be used on riparian lands.[9] Yet four years later, in reversing the denial of an injunction against the use of water on non-riparian land, the court did not rely heavily on *Hendrix,* supra. Instead the court (Russell, C.J., writing the opinion in both cases) based its decision more on general riparian water law principles than on the non-riparian use. *Robertson v. Arnold,* 182 Ga. 664, 671 (186 SE 806) (1936). To the extent that *Robertson v. Arnold* might reflect ambivalence as to the rule announced in *Hendrix,* that concern is well-founded.

A major study of Georgia water law concluded that "Another disadvantage of this doctrine is that it permits the use of stream water only in connection with riparian land." Institute of Law and Government, University of Georgia Law School, *A Study of the Riparian and Prior Appropriation Doctrines of Water Law* (1955), p. 104. Likewise, the American Law Institute now recommends allowing use of water by riparian owners on non-riparian land, Rest. Torts 2d § 855, as well as allowing non-riparian owners to acquire a right to use water from riparian owners. Id., § 856(2), (see also 7 Clark, Waters and Water Rights 71-72, § 614.1 (1976)). The Restatement relies on two principles: that riparian rights are property rights and as such could normally be transferred, and that water law should be utilitarian and allow the best use of the water. Id., Comment b. Also, the Institute considers the acquisition of water rights by condemnation a "grant of riparian right." Id., comment c.

Georgia recognizes the power to condemn riparian rights; in fact, this court relied on that principle in affirming an injunction in *City of Elberton v. Hobbs,* 121

---

[9]It should be noted that the use of water in steam locomotives was a non-riparian use of that water unless the railroad right of way was considered riparian land wherever it went. See, for example, *Goodrich v. Ga. R. & Bkg. Co.,* supra, where such use apparently was approved.

Ga. 749 (2) (49 SE 779) (1905) (see also the second *City of Elberton v. Hobbs,* 121 Ga. 750 (49 SE 780) (1905)). *City of Elberton,* in turn, was relied on by the court in *Hendrix* for the proposition that water could not be used on non-riparian lands. In our view, *City of Elberton* is not good authority for that rule; rather, it established that the right to use water on non-riparian lands can be acquired by condemnation. We agree with the American Law Institute that the right to use water on non-riparian land should be permitted and if that right can be acquired by condemnation, it can also be acquired by grant. Thus we find that the right to the reasonable use of water in a nonnavigable watercourse on non-riparian land can be acquired by grant from a riparian owner. The contrary conclusion in *Hendrix v. Roberts Marble Co.,* supra, will not be followed.

4. In summary, the grant of summary judgment, and the permanent injunction based thereon, against each of the defendants must be reversed. On remand, the issues must be tried in accordance with the foregoing decision, looking always to see if, insofar as injunctive relief is concerned, all the uses of the creek and pond can be accommodated.[10]

*Judgment reversed. Undercofler, C. J., Nichols, Marshall and Clarke, JJ., and Judge Charles L. Weltner, concur. Jordan, P. J., dissents to Division 3. Bowles, J., disqualified.*

ARGUED NOVEMBER 20, 1979 — DECIDED
MARCH 12, 1980.

---

[10]Kates, supra, 35-36; *Oostanaula Mining Co. v. Miller,* 145 Ga. 90 (88 SE 562) (1916). It would be inappropriate for us to undertake at this time to give other instructions as to how the case should be tried. However, lest the trial court feel that we have not provided sufficient guidance for such trial, we refer also to Rest. Torts 2d § 850A, p. 220. While we cannot and do not here approve all that is said therein, we refer to it for whatever help it may be.

*Smith, Geer, Brimberry & Kaplan, Daniel MacDougald,* for appellant (Case No. 35615).

*Stone & Stone, William S. Stone, Frank H. Lowe, Jr., Thomas H. Baxley, Jesse G. Bowles, III, Kenneth L. Hornsby,* for appellees (Case No. 35615).

*Jesse G. Bowles, III,* for appellant (Case No. 35616).

*William S. Stone, Frank H. Lowe, Jr., Thomas H. Baxley, Kenneth L. Hornsby, Daniel MacDougald,* for appellees (Case No. 35616).

*Kenneth L. Hornsby,* for appellant (Case No. 35617).

*William S. Stone, Frank H. Lowe, Jr., Thomas H. Baxley, Jesse G. Bowles, III, Daniel MacDougald,* for appellees (Case No. 35617).

*Frank H. Lowe, Jr.,* for appellant (Case No. 35618).

*William S. Stone, Jesse G. Bowles, III, Thomas H. Baxley, Kenneth L. Hornsby, Daniel MacDougald,* for appellees (Case No. 35618).

*Thomas H. Baxley,* for appellant (Case No. 35619).

*William S. Stone, Jesse G. Bowles, III, Kenneth L. Hornsby, Daniel MacDougald, Frank H. Lowe, Jr.,* for appellees (Case No. 35619).